May it please the court, my name is Davina Chen and I will be arguing the joint jurisdictional issue first. I'd like to reserve three minutes for rebuttal. The punishment of local criminal activity is traditionally and presumptively a state power. If Congress seeks to intrude on state's police power, it must clearly indicate that intention. Congress has not clearly indicated an intention to reach crimes on California's state waters, major and petty, based solely on their location. Congress defined the special maritime territorial jurisdiction of the United States in Section 7. Other than the Great Lakes, it excluded all state waters. The district court correctly held that Section 7 does not include California's ocean waters, but the district court erred in determining that in 1996, Congress quietly undid that exclusion without amending 18 U.S.C. Section 7, the definition of FMTJUS, in an obscure congressional declaration, passed without any congressional discussion or debate, in conflict with what the House report, the only legislative history on this, explained the declaration would do. So you're talking about the part of AEDPA, and I guess I'm just wondering why it's so I mean, AEDPA was a pretty big statute, and this is a piece of AEDPA. So why is it like a secret thing? It's a miscellaneous declaration in Section 901, and it was quiet because it was not mentioned in any of the debates or in any of the discussion of AEDPA. And AEDPA, many parts of it, the parts that we're most familiar with, are all about deference to state courts. And so it would be odd if Congress, in a provision not mentioned at all by anyone, took jurisdiction over waters that had, for 200 years, not been part of federal criminal jurisdiction. So it's not a matter of there was no law, and then Congress just passed a declaration, and I call it quiet because Congress knows how to amend its definition. It has amended 18 U.S.C. 7 five times, four times before AEDPA and once after. And so we know that it knows how to amend it when it intends to increase federal jurisdiction. AEDPA Section 901 also has a Section 901B. And in that provision, it did amend 18 U.S.C. 13, because in that provision, Congress was expanding federal jurisdiction. I guess I'm wondering how we know, though, that Congress didn't mean to just have AEDPA be a standalone provision that's not amending Section 7, because Section 7, as I understand it, is referenced by other parts of criminal law beyond Title 18. And so maybe what Congress meant to do in AEDPA is have the Title 18 crimes be prosecutable by the federal government within the three miles, but not the smaller crimes that are sprinkled elsewhere. Why wouldn't that be rational? I don't think the question is whether it's rational, but it is rational, because there's really no – those have always been paired. Every other crime that is federal only because it's in a special American territorial jurisdiction of the United States always refers back to 18 U.S.C. 7. So it would be pretty odd for Congress to decide that only for Title 18 offenses, we're going to seize the entire territorial sea, but no other offenses. I mean, what effect do you give the language to Section 901A of AEDPA? Do you just want us to ignore it? No, I don't want the court to ignore it at all. I want to look at what it actually says. And so what it says is that that portion of the territorial sea is special maritime territorial jurisdiction of the United States. Before AEDPA was passed, between 1988 and 1996, there was this gap. So up until 1988, it was really clear that the high seas began where the territorial sea ended. Because most of the state waters ran to the same point, everything was like there's just this line. In 1988, the President expanded the territorial sea to 12 miles. He was allowed to do that. Most of the treaties permitted that. But because the high seas, by definition, belong, stretch beyond the territorial sea, that moved probably the territorial sea out to 12 miles. So the question was, what to do with the 3 to 12 miles? 901B is very clear. It addresses just those, just those 9 miles. I'm sorry, I think I said 12 miles. It addresses just those 9 miles. 901A talks about how it addresses the expansion of the territorial sea, it's the extension of the territorial sea to 12 miles. Proclamation of 1988 did not expand the territorial sea inward. The territorial sea has always begun at the coast. So when we're talking about the expansion of the territorial sea, it's only outward. It's that 3 to 12 mile zone. That's where, that's what 19, the work that 1988 proclamation did. I don't understand why Section 7 wouldn't have, by its own terms, automatically filled this gap in the way that you're saying EDPA had to fill the gap. It should have. And I think that, so there's two answers to this question. One, I believe that Section 901A did not need to say that in order to fill that gap. But 901A did do so. Which is, it says in the parts before the Special Maritime Territorial Jurisdiction that that's all under the sovereignty of the U.S. government. So that made 3 to 12 U.S. sovereign waters, whereas before it had been high seas. So the proclamation specifically said it's not going to, it doesn't alter any federal or state law. And so the AETPA, it said these are sovereign waters. And that does alter federal and state law. So for example, in our sovereign waters, foreign ships are subject to U.S. jurisdiction. Outside our sovereign waters, only U.S. ships and state vessels are subject to U.S. jurisdiction. By clarifying that even though the proclamation said that this doesn't alter federal or state law in any way, by announcing that this 3 to 12 mile zone was now sovereign waters, it did make a difference. It just didn't make the difference that the government is saying it's made. The United States Supreme Court in Bond is very clear that we do not presume that statement that Congress intends to intrude on police powers. In fact, we presume the opposite. In Bond, the language, and this is the case about the Chemical Weapons Treaty, and the language of the statute very clearly included household chemicals. But the Supreme Court said we will not read that to include household chemicals because we don't believe that Congress would have quietly, surreptitiously turned state assaults into federal crimes. Likewise here, I say it's quiet because Congress knows how to amend the statute. It amended it five times. It didn't amend it here. And it amended 901B even though it's part of the same provision because 901B did, in fact, expand federal enclave jurisdiction. Congress doesn't act like this. If it had wanted to amend 7, the definition, it would have done so. Do you want to save time for rebuttal? Yes, please. Good morning and may it please the court. Rajesh Sridivasan for the United States. The defendant's argument makes a complicated case out of a very simple one. This case is resolved based on two basic principles. A law becomes enforceable when it is passed by the House and Senate and signed by the President, not upon codification in the U.S. Code and its enforceability does not depend on where it's codified. The second principle is Congress means exactly what it says in a law. Those principles resolve this case because in AEDPA, Congress declared that all the territorial sea of the United States as defined by the Presidential Proclamation 5928 was within the special maritime and territorial jurisdiction of the United States. That cross-reference should bring the court to what the Presidential Proclamation defined as a territorial sea. And it said the territorial sea of the United States henceforth extends 12 nautical miles from the baselines of the United States determined in accordance with international law. Defendant's argument ignores the word from the baselines. Baseline is defined in Black's Law Dictionary and is accepted in international law as the low watermark. In other words, the low time mark or as I'll simply refer to it for ease the coast. So what the Presidential Proclamation defined the territorial sea as is everything from the coast to 12 miles out. By cross-referencing that definition, Congress added that as a basis for special maritime and territorial jurisdiction in 18 U.S.C. 7 in the statutory note. And that is an enforceable law that this court must follow. Do you think it's just a standalone law or do you think it amended Section 7? I don't think it amended Section 7. And here's why. The Presidential Proclamation doesn't reference a provision of Section 7 nor does AEDPA. It's not like it's amending the definition of high seas. I think your point, Judge Friedland, was correct that it could have very well been that Congress just wanted to expand special maritime and territorial jurisdiction for Title 18 offenses and didn't want it to extend outward to other cross-references elsewhere in the U.S. Code. Language in Section 7.1 will continue to exist and not be impliedly repealed as your friend on the other side argues. That's correct. And the implied repeal argument doesn't quite make sense to me because 18 U.S.C. 7 doesn't limit federal jurisdiction. It defines it. It grants the power to the courts over certain offenses depending on where they occur. There's nothing in the section that says, and the federal government shall not have jurisdiction where the state has jurisdiction. So defendants argument that high seas somehow limits the meaning of the statutory note doesn't make sense to me. It also doesn't make sense to me that the statutory note would have any less effect because it's a statutory note and not an amendment to Section 7. As this court knows, the decision of where to place a provision in the U.S. Code is decided by an office of the House of Representatives, the Office of Law Revision Counsel. Sometimes they determine or Congress decides to explicitly amend a statute. But where they don't, it's still an enforceable law, but the Office of Law Revision Counsel needs to make a decision of where to put it. And if it's a related enough provision to a preexisting provision of the U.S. Code, they'll often make it a statutory note. The statute is not the only one like that. There are other statutes that also include significant language, enforceable language, and statutory notes, including one statute that defines the ongoing relationship between the U.S. and the Soviet Union. So there's nothing that makes it less enforceable simply because it is a statutory note. Is there a reason? So, I mean, I think it can fit together logically this way, but is there a reason why AEDPA would extend the Title 18 crimes into the full three miles and not other crimes that are elsewhere in the code? I think it depends. My best speculation is that where crimes are defined outside of Title 18, they're usually a comprehensive regulatory scheme for a specific area. I'm thinking of, like, drug offenses and the MDLEA, which defines jurisdiction for those drug offenses or health labeling offenses, things like that. So my best guess is that Congress decided that for those areas where they're specifically legislating in a different title, they may want to do something different with jurisdiction. But for Title 18, which is just a general criminal code, this is the definition that they wanted to use. But again, I'm speculating over their possible reasoning. The other point I wanted to make to the court is the defense in their briefing makes a significant deal about the venue statute that was passed at the same time as 18 U.S.C. 7. And they say that Congress would not have enacted a venue statute that contradicted 18 U.S.C. 7 if high seas included, meant everything outside of state territory. The problem with that argument is that when Congress enacted 18 U.S.C. 7, that's exactly what it did mean. In 1948, that was one year after the Supreme Court decided U.S. v. California. In U.S. v. California, the Supreme Court said that what California thought was their territory, the coast, the three miles out, was actually federal territory. So when Congress passed 18 U.S.C. 7 and gave jurisdiction over the high seas and included a venue provision in 3238 that said venues proper wherever the arrestee is brought, they had no reason to think that states had any right over any part of the high seas because U.S. v. California said that federal property rights begin at the low tide mark and extend outward. So I don't think that there is any contradiction between the two provisions, but even if there were, the Constitution controls. And whereas here an offense is committed on the high seas but within a district and a state, the offense must be tried there. 3238 will apply to the lion's share of the high seas, most of which, by a matter of geography, are in international waters. But where it doesn't, the Constitution controls. And as happened here, the offense needs to be tried in the state and district where the offense occurred. Unless the court has any other questions, I don't think the court needs to reach the high seas definition argument, and I think this case is much more simply resolved by the ADPA statutory provision. But the arguments in our brief still stand that high seas has always meant what we've said in our brief. Thank you. We have some time for rebuttal. I just wanted to direct the court's attention to page 36 of the opening brief, which talks about the other offenses that are referenced to section 7, and they're not, as the government described. But what I really want to emphasize is the federalism canon. And the reason why the meaning of high seas is important is because from the founding, these high seas offenses did not cover state waters. I went back and looked at the Articles of Confederation, same thing. High seas offenses went to Congress, and we know that at that time the states were not ceding any state jurisdiction to Congress. From the very first federal statute, high seas offenses were federal offenses. In that very first statute, the 1790 statute, it makes very clear that those high seas offenses, all of them, not just the lion's share or some portion, would be tried in the district of apprehension, not the district of commission. All these show that the high seas did not include state waters. And why is that important? Because it shows us how we can interpret Section 901A. For 200 years, Congress abstained from state waters. The debate from 1908 is exceptionally clear. The senators did not want to grant federal jurisdiction over vessels on state waters. And that's why I say that Congress would not have surreptitiously erased 200 years of history in this declaration that doesn't even amend the definition of SMTJUS. Does 901A have meaning and purpose? Yes. It defines... It's clear you're not making an argument that the statute, however it's interpreted, is unconstitutional, are you? I am making an argument that we have to interpret it against the federalism canon. I understand that, but I just want to be clear that you're not suggesting that one of the possible interpretations that's being argued in this case would cut us out of the Constitution. I'm not making that argument, but I'm also not saying it's not correct. In cases that are on this line, so there's a Tenth Circuit case, McKee, which I read recently, we need to know what was Congress's basis. So if Congress's basis in extending the Special Maritime Territorial Jurisdiction to the shore was the High Seas Clause, the Felonies Clause, yes, that would be unconstitutional. If its basis was the Admiralty and Maritime Jurisdiction Clause, it may or may not be unconstitutional depending on how far you think that clause reaches. But the court doesn't need to reach that question because it doesn't reach the state waters. The government says that I think the Proclamation of 1988 says that the territorial sea begins at the shore or at the territorial baseline. I'm not ignoring it. The territorial sea has always begun at the territorial baseline. What I'm saying is that for those first three miles, that's state jurisdiction. And under the federalism canon, that's an absolutely clear intention to erase 200 years of state intention. I'm a little confused why it's such an imposition on federalism, though, because we have federal crimes existing in states at the same time that state crimes exist in states. This is a thing that happens all the time and is kind of a normal part of federalism, that there's overlapping. Over some territory, there are federal crimes and state crimes, and either one could be prosecuted. No doubt. In most of those, it's because there's a federal interest. In Bond, when they said that this Chemical Weapons Act invades state province, they weren't saying that Ms. Bond couldn't be prosecuted stateside. She was, in fact, prosecuted stateside. But what the Supreme Court says is we defer to the states in those contexts. It's part of our constitutional structure that the state has the police power and that the federal government only takes that power when it has a federalism interest. And did California try to prosecute these crimes? California could try to prosecute these crimes. The government took it immediately. It was investigated by the Coast Guard. But California has very clear law that indicates that any crime that begins within California is in California's jurisdiction. So why shouldn't we take the presidential proclamation and EDPA as evidence of a federal interest? So the presidential proclamation is evidence that the United States wanted to expand its territorial sea to 12 miles. So there is a federal interest in the waters all the way to 12 miles. I understand that, but you have said that you don't dispute the idea that the territorial sea has always been at the baseline out. And so I'm struggling with why it is that we should look at both this action from the executive branch and the legislative branch, which seems to suggest that federal jurisdiction exists over the entirety of the territorial sea, which nobody is disputing goes up to the shoreline. Why do we not have a federal interest there? Because the territorial sea has always begun at the shoreline. It has begun at the shoreline since 17-whatever. And in 1793, the Secretary of State, Thomas Jefferson, took the first three miles. This is why I was asking the constitutional question, because even if we accept that that's true as a matter of history, if we don't have a constitutional overlay here that's a problem, why couldn't, in the modern world, the President and Congress say, you know what, we want to have jurisdiction over that part of the territorial sea? Well, the President didn't say that. So the President said that nothing in his proclamation would alter federal or state law. He was very clear. So the President didn't do that. So then the question is, did Congress do that? And that's exactly what I'm arguing, is that Congress didn't do that. If Congress had wanted to take the entire territorial sea, it didn't need to even mention the proclamation, because what it was saying was that for the very first time in history, in 200 years, it was actually seizing the first three miles also. But what I wanted to get to was Judge Cleveland's question. So in Bond, it was the same situation, right? There was a state crime, and there's a federal crime, and the Supreme Court said, we're not going to call this a federal crime, because interpreting the term chemical weapon as broadly as it's written, let's be clear, it was written very broadly, and a plain reading of it would have included household chemicals. That would invade the federalism interest. It's the same in Bass, which is the firearms cases. Yes, there's state firearms offenses, and there's state firearms offenses. But the Supreme Court refused to read the federal firearms offenses to be so broad that it would basically upset the balance between state and federal powers. And that's what this is. This is upsetting the balance. The reason we have no cases, you know, like every case that every party has cited is not directly on point. It's because the federal government doesn't prosecute these cases. The state government prosecutes these cases. The government wants to now have the federal government prosecute these cases. And the Supreme Court is very clear that when this is an increase in federal resources, it causes conflict and friction between state and federal government. And if Congress wants to upset that state and federal balance, it needs to speak clearly. And it didn't. Okay. I think we have you over your time. So I think we need to move to the next part of the case. So ten minutes again on the clock, please. And I think we're starting with the Lee arguments, correct? Is that everyone's understanding? Yes. Is it me again? It is you again, I believe. So Davina Chen again for Wong Lee. And I'd like to reserve three minutes for rebuttal. If the court finds no jurisdiction, then that ends the case. But if it reaches the merits, then three errors require a new trial. First, the prosecutor told the jury that even if it believed every word of Lee's testimony, he was still guilty of first-degree murder. For abandoning his assailant in the water. That is not the law. Second and third, Mr. Lee was denied his right to a unanimous verdict from an impartial jury when some of the jurors first bullied the holdout juror off the jury. And then, rather than beginning deliberations anew, influenced the newly seated juror with the same timeline that they had used to try to convince the juror who had been removed. Unless the court has a preference, I was going to address these arguments in order. I actually would like for you to address the juror issue first. And I'm interested in having you talk about how we reconcile Murphy with the argument that you're making. Okay. So Murphy, I believe, is the case where the defendant was permitted to, by a signed stipulation, agree to 11-person jury. Is that right? Yes. So Murphy is an odd little case. It appears to me to rely completely on the fact that Rule 23 has three different provisions for consenting to a juror of less than 12. And the one that applied in that case had no requirement that there be good cause. So that's what the court held. They said that in – I think I saw a bound by Murphy, but I'd like to know from you whether you think Murphy was correctly decided. I don't believe that Murphy was correctly decided. I believe that the dissent had the better argument in Murphy. And I do think that since the Supreme Court has just granted cert on a question of whether a 12-person jury is constitutionally required, that we may see some changes in Rule 23 in the near future. But as this court is bound by Murphy at this time, I think it's highly distinguishable because, as I said, the specific rule that applied in that case didn't require a finding of good cause so long as the defendant personally, in writing, agreed to it. So our case, we don't have that. We don't have the defendant personally doing anything. Nothing is in writing. And it wasn't under Rule 23, whichever rule it is, that doesn't require good cause. It was under the rule that does require good cause. And the rule that does require good cause, we know from Simington and Ullah that good cause does not include this juror was not convinced. If a juror is not convinced, there are two options. You can order them back to deliberate more, or you can grant a mistrial. Nobody is saying that BJR should have been ordered back to deliberate more. The government, in its 28J letter, talks about how that would be egregious. That is not what we are arguing. What we are arguing is that Mr. Lee had a right to a mistrial at that time. And because of double jeopardy concerns, was there a better or worse way for the court to have handled this? Like what do you think the court should have done if it wanted to make sure that there could be a retrial? It found that there was manifest necessity for a mistrial. So long as there's manifest necessity for a mistrial, it can be granted. In this particular case, trial counsel suggested that it would be okay to remove this juror. But trial counsel did not insist on it, nor did trial counsel waive any right to a unanimous jury. So if the judge wanted to do what was proper, and I'm not blaming the judge, but he should have granted a mistrial. I mean, up until 1999, that was the only option, right? When one juror couldn't continue, there was a mistrial. And for the entire period of the federal rules up until that point, there had been proposals to allow juror substitution, and they had always been rejected. So I'm interested in how we would write a decision in this case that would not lead to confusion for district courts going forward if they're trying to grapple with the rule you're asking us to adopt while also having Murphy continue to exist, because as you've conceded it will, because we don't have the authority to rule it. So I'm interested to know how we write a decision that would give adequate guidance to district courts going forward and what to do when there is a juror who, you know, so may you walk me through how you would write that decision? Okay, so rather than, well, I don't make decisions. Rather than walking through decisions, let me think that I'm, you know, in court and that's happening. And the judge says, well, I don't believe that I can remove this juror because it's clear to me that this juror, the impetus for her removal is her view of the merits of the case. So I think we have only one option, and that is to declare a mistrial. And then let's say the attorney is very insistent that he wants to take the 11-person jury. I think that you need to take it from the defendant in writing, and the person has to say, I understand I have a right to a mistrial. I understand I have a right to a unanimous jury. What I'm asking for is a verdict from an 11, a unanimous verdict from an 11-person jury. In Murphy, the reason why it has an odd result, but the reason why the court gave was that this in writing, personal really ensures that the defendant and his counsel understand the seriousness of the decision. And in this case, we don't have any of that. I'm thinking that Murphy is going to be overruled soon by the Supreme Court. I'm wondering, like, why do we need to deal with Murphy? Because this isn't an 11-person jury case. This is a 12-person jury case.  Exactly. I'm just saying that if the court were to write an opinion and wanted to be clear to the trial judge that, like, if you're reading Murphy, this is the Murphy route. I'd like to reserve the time for that one. May it please the court. Again, Rajesh Srinivasan for the United States. None of defendant lays three individual issues warrant reversal unless the court wants me to start elsewhere. I will start where my colleague left off, which is the juror dismissal issue. The court doesn't even reach that issue in this case because defense counsel waived this argument by consenting to dismissal of the juror. This is not the kind of structural error that is unwaivable. It's not the kind of error that would diminish faith in the judiciary or infect the entire process. It was a strategic choice. No one knew where this juror stood at this time, but they did know that she was threatening to hurt herself. And the court was incredibly concerned about that. We have law that says you can't waive the right to a unanimous jury. So I'm a little struggling with how you just jumped to, right, this is waived. It seems like don't we have to figure out whether there was a problem with how the juror was removed that prevented there from being a unanimous jury. I would say there would be a problem if this were a unanimous jury case, but I don't view it that way because the defendant did get a unanimous verdict. But only after this juror who seems to have been having problems agreeing with everyone was removed. Even if this court were to find that this is not a waivable right, at minimum it's forfeitable. And so review, if any, would be for a plain error. And there is no clear or obvious error in this case, given what the district judge was able to observe. And this is one of the cases where the district judge really is at a better vantage point than this court for evaluating what is happening. The reasoning of the district court was not that there was disagreement between the jurors on the merits, as in Simington or Litwin. The district court's concern was that this juror was threatening to hurt herself. And, in fact, in the transcript, the judge notes that he's having a U.S. marshal watch over her to ensure her safety. It seems like everyone agrees she had to be removed. So, I mean, I think the defendant is not disputing that. It's just whether at that point there had to be a mistrial. So if she's removed because her stress is because they can't agree, do you agree that that's a problem under the case law? I don't think that's a problem under the case law. And I would point particularly to cases where there is an issue with jurors having an emotional problem that prevents them from deliberating. I would point this court to U.S. v. Beer. The standard is, and I'll read it, if the record evidence discloses any reasonable possibility, the impetus for a jury's dismissal stems from the juror's view on the merits. The court must not dismiss the juror. It seems to me that it can be true that a person is having an emotional or mental health issue and also has problems on the merits of the case. And if you dismiss that jury and both of those things are true, then the standard is met. But that juror shouldn't have been dismissed. I don't think that's correct. And I'll give you a case citation for why. U.S. v. Beer, 161 F. 3rd, 1190, which is a decision of this court in 1998. In that case, if I'm remembering the facts correctly, there were two jurors who were disputing over the merits of the case. One juror was saying how ridiculous the case was. And these people got into a huge argument over the case. And the court ended up dismissing both of them because their emotional instability, they were crying, prevented the jury from deliberating, prevented them from deliberating. It's the same situation we have here. If a juror is threatening to hurt herself rather than engage in deliberation, that's not a problem about her view of the merits of the case. That's a problem of the jury not being able to function because there's a danger to a juror. I don't think that a juror has a heckler's veto over a case and can cause a mistrial by declaring emotional instability. They have a heckler's veto and can result in a mistrial if they just refuse to change their vote. That's correct. And if that were the evidence that were in front of the judge, then we might have a different case. But no one knew where she stood. Often you look at this record and say there's a reasonable possibility that the reason that she is so stressed and having such an emotional reaction is because she's not willing to change her vote and no one else in the room is willing to accept her answer. Again, I don't think that pressure from other jurors is enough or the implication that there might be something on the merits. I think that would contradict Beard. You're citing Beard, but I don't think it was in your brief, so it's a little hard to know what you're talking about. What did Beard say? Beard said that where the two jurors were unable to work with each other, they were yelling at each other, they were calling each other names. Both those jurors were dismissed by the court over the defense counsel's objection because it was preventing them from deliberating. And then what happened? What did our court say? The court affirmed and said that was okay. There were only 10 jurors? There were two alternate jurors who replaced them. I haven't read that case either. Does that case deal with Symington? Because Symington has got the standard. I just read to you about a reasonable possibility that the merits is at the root of this problem. I'll confess I can't remember if it gives a citation to Symington. I would imagine that it does, but I don't want to represent something that I can't clearly remember. But Perez is in our briefing, and in Perez, it was a similar circumstance where a juror was unable to continue. There was some indication that it might be related to the merits of the case, but the court still said that was okay. So I don't think that any relation to the merits of the case or some implication that the pressure of other jurors might be contributing to the problem means that a district court cannot preserve and conserve judicial resources and appoint an alternate juror who is just as capable of rendering a verdict and ensure that the trial reaches an outcome instead of redoing a murder at sea trial all over again. I'll briefly say, in addition, that I don't think that there's clear or obvious error at minimum. This discussion shows that Symington-Litwin, there's some space between Symington-Litwin and Perez and Beard, on the other hand. So a district court faced with this issue couldn't be confident how exactly this court would need him to handle it. And the district court did what it thought best for this juror's health and for the parties, given that the trial had already completed. So we haven't – I mean, it's been teed up, I think, in Litwin, maybe, but not answered about whether this kind of a situation is a structural error or not. But it seems to me, reading our cases, that if an error is found, reversal follows, which would be counter to the argument that you're making. So why shouldn't I read our precedent as suggesting that that's the course of events? Unless I'm not recalling them correctly, I don't think any of those cases were plain error cases. I don't think there was consent or acquiescence to the dismissal in any of those cases. But then we butt up against our precedent that Judge Friedland has referenced, that the right to a unanimous juror, at least in the Ninth Circuit – I don't know if this is true across the country. I don't even know if it's right. But in the Ninth Circuit, the rule is the right to a unanimous juror is not waivable. So if we butt up against that and then we butt up against these cases that seem to suggest that when you've got an error in this space, it's reversible – I mean, I'm starting to wonder if we are sort of hemmed in on this. What I would suggest is the United States v. Gomez fundamentally changed the way that this court looks at plain error. Constitutional errors are also forfeitable. And so to the extent that this is a constitutional error, it doesn't mean that it's necessarily a structural error. What would be the difference between waive and forfeit in this context? I don't understand why you could say it's not waivable but it's forfeitable. At minimum, it's forfeitable. I think the better argument is that it's waived. But at the very least, the defendant didn't object to this procedure. So the court would have no way of knowing – no way to correct course. For example, if the defense counsel said, I still don't think we can do this, I want a mistrial declared, at least the judge could have considered what to do under this court's precedent. The court wasn't given that opportunity. So I think that puts it in the plain error category. If we think that all the court could have done is declare a mistrial, then we could just do that now. I mean, we'd essentially be doing that now. I'm not sure what more could have happened. Like this juror had to be dismissed. So you either have to have a mistrial or you don't. And whether you object or you don't, whether it's plain error or you don't, I don't understand. That's either the answer or it isn't, isn't it? I think that ignores the plain error standard. That would be true in a lot of plain error cases. Walk me through how. I mean, what prong of plain error – I don't really understand. Like the point of plain error is to give the judge a chance to fix it. I mean, walk me through what you think the plain error standard is going to do for you here. The plain error standard is – requires clear or obvious error. And it's not just about the judges. It's also about ensuring that defendants don't sit on their rights and don't sandbag the court in order to get a second bite at the apple. So even if the judge could not have done anything, a defendant should not be rewarded for not objecting when they could have objected and later raising this argument on appeal and requiring a retrial of a massive, significant murder at sea case. And so you think because that would be your policy argument, plain error applies, and we say that the problem is at which prong? Prong two, and I would also suggest prong four. I think it would undermine the integrity and perception of the judiciary to reverse the case when a 12-person jury and an alternate juror who no one is accused is biased rendered a unanimous verdict finding guilt. Unless the court has any other questions. Thank you. If a right is unwaivable, it's not forfeitable. Only rights that have to be asserted in order to be preserved can be forfeited. That's the definition of forfeitable. So in terms of defendants sitting on their rights, we have two cases. We have ULA and we have Lopez. These are not just cases of defendants sitting on their rights. These are cases of defendants affirmatively agreeing to a unanimous jury. And this court held, well, even if they want to do that, it's not their right to waive. It's society's right. Society has a right to have people suffer criminal punishment only if they have been convicted by a unanimous jury. So we're not going to worry about maybe it was strategic or et cetera. It's not waivable. The government says if it wasn't waived, it's at least forfeited. That's answered by the first question. If you can't waive something, you can't forfeit it. But even if there were some new rule that rights that can't be waived can be forfeited, we would still prevail. Sittington is crystal clear. There is no question that this juror, they said, is your mental health worsening because of pressure to reach a specific verdict? And her answer to that question is yes. Plainly under Simington, a mistrial was required. So even if, I mean, I don't see actually how you can even apply plain error review to a non-waivable right. But even if you could, it would be met. Finally, with respect to Beard and I think Perez, both of those preceded Simington. Beard, I don't know what it was about because it was a 1998 case. And the rule that permitted substitution of juries didn't come into effect until 1999. So I'm not sure what kind of case that was. But I'm happy to look at it and provide supplemental authority if the court requests that. Perez is the case that in Simington, the Ninth Circuit specifically held is not the standard. It held that that is a habeas case and this case is on direct appeal. And so, therefore, it is not the standard. Finally, the government said that ruling in Mr. Lee's favor would grant BJRA Heckler's veto. I'm not quite sure what that means. But there's a reason why our founding fathers demanded a unanimous jury as the Supreme Court has held recently and is about perhaps to hold that a 12-person juror is required is that with a larger juror where everyone has to agree, that is the standard that is required in order to take away somebody's liberty. Thank you both sides for the helpful arguments. Okay, so the Lee case is now submitted. And we now will have arguments in the Ritz or Rizzi case for 10 minutes each side. Good morning, Your Honors. My name is Dave Weikert. And along with Courtney Cifali, who is with me at counsel table, we represent Sheikha Ritz. I'll ask for one minute of rebuttal time if that's okay. And I'd like to address two issues that we've had multiple issues in our brief. But the two issues I'd like to address is, one, the wrongful admission of her post-arrest statements, and, two, whether or not there was an illegal intrusion during the jury deliberations when the judge allowed the victim's mother to sit through the jury's review of the tape. So with regard to issue number one, a little after 5 a.m. on the morning of December 19, 2019, a phalanx of heavily armed SWAT team agents descended on Ritz's small apartment. Sheila, as usual, was trying to sleep off another night of abusing drugs and alcohol. She hadn't gotten very far since she had gone to bed at about 4.30, and it was 5 o'clock when the arresting officers came into her house. Using SEAL team tactics straight out of Bin Laden's Abbottabad compound, the SWAT agents used flashbangs. The purpose of flashbangs is to disorient and disable. And during the course of the use of the flashbangs, Sheila Ritz had a noticeable gash on the top of her head. In her recollection, she got that gash because she was hit by a flashbang. One of the SWAT team members during the course of the motion and limiting testified that, no, that didn't happen, that she must have hit her head because she was disoriented during the use of the flashbangs. The fact that she believed she was hit in the head and that caused the injury is indicative of the fact that she didn't know what hit her when the agents came into the house and that she wasn't fully aware of reality at the time the agents then marched her out of her apartment in her nightclothes and put her into a van on a cold December morning when she was shivering. Counselor, you tell a compelling story for sure, but we're on review. The district court made factual findings that are contrary to the story that you're telling, and we review those for clear errors. So how do we look at how the district court viewed this and say that it was clearly erroneous? I think the district court's finding on the issues of knowledgeable and intelligent waivers were clear errors, and I can get into why. In terms of voluntariness of the relinquishment of the Miranda waiver, that's a different standard. That's a de novo review by the court. What the district judge did was the district judge focused on the two hours of tape, and you can go through the two hours of tape. So is your argument there that we really shouldn't apply clear error because we can look at the same thing that the district is looking at, and you want us to do some sort of de novo review? I want you to do de novo review on the voluntariness of the waiver of her Miranda warrants. Well, I understand on the voluntariness question, but that's a mixed question ultimately, and it's based on a factual finding about how responsive is she and how disoriented is she. Those are facts that normally we should review for clear error is my understanding. There are really like no facts that were in dispute other than the court's conclusion that her waiver was knowing and intelligent. But the facts leading up to that conclusion aren't really disputable. There's no question that the agents went in and used flashbacks. There's no question that when she sat down with the agents in the van, she complained that she was cold because she was in her nightclothes. The district court found that there was no question that she was using drugs and alcohol that night. The only question was how did she get her injury. But in terms of the voluntariness of the Miranda warning, one of the first things that the agent says is, Sheila, we know your head is spinning. They know their head's spinning because she was subjected to flashbacks. That's not a disputable fact. And after they give her the Miranda warnings, and unlike the cases the government cites where the Miranda warnings are given in writing, there weren't any written Miranda warnings. They were read to her and she had like a one-word acknowledgment. And after that, the agents start questioning her and ask her, do you know why you're here? And her response was that her head is spinning and her eye is bleeding and she's out of it. And that was her initial response right after the Miranda warnings. And so our take on the first interview is that the court erred in focusing on the entirety of the interview because the question was whether or not the original Miranda warning was a valid relinquishment of that right, whether she understood at the time that she came out of her apartment after being flashbanged with a gash in her head, in her nightclothes, in a cold van with her head spinning, did she voluntarily relinquish those Miranda rights? And our position is she didn't. And if the court finds that she didn't, then the second interview goes out automatically because there were no Miranda warnings in the second interview. The district court found that her cognitive abilities were very good. David, you want us to say that that's clear error? Yeah. I think you have to make the determination that the court erred in terms of what her cognitive abilities were, but you can use the circumstances that are apparent from the interview that came out during the course of the motion in limine to say under these circumstances there was no way that she could have a voluntary waiver or non-intelligent waiver. Now, the standards are different because the standards are clear error with regard to knowing and intelligent and de novo with regard to voluntariness. But on all those issues, the circumstances are totally compelling. I know no situation where someone is subjected to a military attack, taken into a rendition van, says that her head is spinning, that the agents acknowledge that her head is spinning, and then they give her a waiver, and that waiver was effective. It wasn't effective. And if it isn't effective, like I said, the second interview goes out. But the second interview goes out even if the first waiver was effective because in the second interview there was no waiver. And the reason the agents didn't give her a waiver was because they wanted her to talk, and so they made the affirmative decision, we are not going to advise her. So instead what the agents said is, one, Sheila, you can help yourself here. Help us help you. They give her a Jerry Maguire kind of line, right, help us help you, before there's any reference to Miranda at all. So that's her thought process, right? The agents are here to help you, which is 180 degrees from what Miranda says, which is we're going to use your statements against you. If we were to agree with you, what are the statements that she made during these interrogations that made such a difference in the balance of evidence? So there's a lot of overlap between the first and the second interview in terms of what statements were elicited. But the nugget, the piece of gold that the government was trying to mine and ultimately got at the end of the interview after the constant references to being separated from her daughter, after the constant swearing at her, calling her statements BS, that her statements were effed up, after all the abuse, the final nugget they were able to mine is that she acknowledged that Dwayne Lee had told her that there was an insurance policy. And why do we know that that was important? That was like oral argument 101, because the government's closing, the last thing in their rebuttal case, the last thing they wanted the jury to go away with was the defense argues there was no motive here. And we know there was motive because it came out of Sheila Ritz's mouth, and the motive was insurance. Why isn't the tracking of the widow the same evidence, basically, later after? So, again, the motive evidence on the insurance, that was... But isn't that because of the insurance that they're tracking the wife later? Well, the tracking issue is something separate. Well, what do you think explains that? So the tracking issue, Sheila Ritz mentioned the tracker in the second interview. I'm just saying, why would they have been tracking her if they weren't trying to get the insurance money? Well, I don't know the answer to that, because the question is, when Wayne Lee asks Sheila Ritz for the tracker, there's an indication what Wayne Lee told Sheila Ritz as to the purpose of the tracker. And Wayne Lee never made a demand on Tree Dow's wife for insurance, which was another anomaly in this. But the bottom line was that when the question came up in my closing, which is what is the motive, the answer was, look at Sheila Ritz's words. Sheila Ritz's words were the insurance. This isn't harmless error at all. This is what they wanted the jury to consider when the jury went back into the jury room. The motive and opportunity, those two aspects of this crime, both came from her statements. The opportunity, this case devolved because the government didn't prove premeditation. This case was about whether or not Sheila Ritz should have driven away after Tree Dow's body hit the water. And so with regard to that, the only evidence the government had as to who was driving the boat away came from Sheila Ritz. They didn't have any surveillance on the boat. They didn't know who drove it away. That came from her statements. And then the only evidence they had of motive was because you're over time and you wanted time for rebuttal. So thank you. But anyway, thank you so much. Let's hear from the government. May it please the Court, once more, Rajesh Srinivasan for the United States. All of Defendant Ritz's arguments run headlong into the District Court's factual findings. I'll start where my colleague left off on the Miranda advisement. The Court found that Ms. Ritz was clearheaded and able to comprehend what was going on. The video playback of the second interview and the audio of the first interview, which the government submitted, bear that out. There's no signs that she was intoxicated, no signs that she didn't understand what was going on. In fact, the opposite is true. Throughout most of the first interview and second interview, Ms. Ritz is trying to minimize what she did and creating false stories about what happened in order to get herself off of liability. I'll give one example, which has to do with the insurance policy. At the end of the interview, the insurance policy does come up, but what Ms. Ritz says is that the victim's widow, common-law widow, conspired with Lay to murder the victim. So even if there weren't other evidence of the tracker and there was, what she said didn't even give the government evidence that she knew what was going on with the tracker and that she had a personal interest in it. She was blaming Lay and the victim's widow. In addition, the defendant in this case had experienced law enforcement. She had been arrested many times before. She had a brother who was a law enforcement officer. She had a friend who was a DA. And she told her interviewer in the second interview that Lay had told her not to talk to law enforcement, but she personally did not believe that. All of these things indicate that she knew what her rights were and chose to voluntarily give them up. Unless the court wants me to go elsewhere, I'll briefly talk about the Miranda re-advisement. The re-advisement was fine under this court's precedent. At most, there was a five-hour gap in between the first Miranda advisement and the second. It wasn't really an advisement at all, was it? Fair enough, Your Honor. The second reminder was that your Miranda rights are still in play. And Ms. Ritz did not show any shyness about noting when she did not understand what was going on. There is a long part of the second interview where the law enforcement agents are discussing a picture of someone in a Santa suit, which I'll confess I don't really understand either. And in those parts of the video, Ms. Ritz is confused and contesting what the law enforcement officers are saying. That stands in contrast to her acceptance that her Miranda rights are still in play. As to intoxication, the nurse who examined Ms. Ritz did not see any evidence of it. And although she prescribed medication for alcohol withdrawal, that was based on her self-report of alcohol abuse, not on the nurse's observations. The video the court could look at, there's no evidence that Ms. Ritz was intoxicated when talking to the law enforcement officers. If the court does not have any other questions, we ask the court to affirm in both Ms. Ritz's case and Mr. Ley's case. I guess I have one last question just about the sufficiency issue. It's a little confusing to me in both cases, the record in terms of what the theory was for the murder. I think the government's ultimate view was that this was a plan from the beginning, and they shot the victim and threw him overboard, and that was that. But it argued also this sort of alternative theory of the failure to help him once he's in the water. And I'm just curious, does that theory jive with an aiding and abetting charge or no? For her, for Ritz, that would just come under Lester included of murder too, right? That doesn't actually map on to an aiding and abetting theory because of the mens rea. Am I right about that? I'm not sure that's right because the jury could have rashly concluded that Mr. Ley committed second-degree murder and that Ms. Ritz aided and abetted that second-degree murder, in which case... Talk me through how the aiding and abetting elements work under that theory. The way it would work is this. And we can consider all of the evidence. I know that my colleague implies that somehow the jury's acquittal on first-degree murder means you can't consider the evidence of first-degree murder. That's not the standard for sufficiency. We can look at the entire record. And here the record sufficiently shows that she would be sufficient to support a first-degree murder charge, let alone a second. But we don't have to make sense of what the jury did. Juries can do things for unknown reasons. That's why we have Rule 606, so we don't intrude onto that. The way I can make sense of it is that the jury could have concluded that Mr. Ley had no plan coming in to kill him but decided to, on the boat, kill him, and Ms. Ritz drove away, ensuring that the death occurred. How does that map onto the aiding and abetting aspect where you have to have the ability to remove yourself from the activity? I'm trying to remember from Rosemont what's the actual framing of that standard. I'm not on the right page of my notes here. You have to have advanced knowledge of the scope and character of the crime, time to withdraw. If they don't have an advanced plan and this idea hatches on the boat, how does the aiding and abetting theory work with that? I'll go back to the evidence that the government believes supported first-degree murder. The evidence showed that she knew that Ley had some plan, at least, to kill Mr. Dow. She told her mother-in-law in Las Vegas, don't look at that guy. You won't be seeing him anymore. She told her co-workers that she had friends who would kill people and that she would kill people on boats. All of those pieces of evidence imply knowledge that by going out on a boat with Ley and Dow, at least if there wasn't a plan, and I would submit there was a plan, then at least she had knowledge that that could lead to a murder of James Dow, which it did. For withdrawal, she didn't have to drive her boat away. The fact that she did, aided and abetted, aided the killing of Mr. Dow. It's kind of the opposite of withdrawal, though. That theory is she should have stayed and done something rather than withdrawing. There's sort of a weird mismatch. Or done nothing. It's not necessarily that she had an affirmative duty to pull him out of the water, but at a minimum, she had a duty not to aid the killing by driving away and ensuring that he drowned. We ask the court to affirm. Thank you. So I reserved a minute. Please forgive me if I talk fairly quickly. The jury rejected premeditation. So the crime basically is what the government said in its closing to the jury. If you reject premeditation, then look at her actions after Sri Dow was shot. And we made that argument at another issue down the road, which is the medical examiner said that even if he had been pulled out of the water, even if Sheila Ritz had tried to save his life, she couldn't say whether his life would have been saved or not. So to that extent, there wasn't proof beyond a reasonable doubt that her actions will approximately cause the death of Sri Dow. But back to the Miranda issue. Can I just ask, though, I'm confused about how your arguments about that comport with the jury's finding that there was a conspiracy. Because it seems like if there was a conspiracy, there was some sort of agreement to do this. And so all the stuff about she didn't mean to and it was all your arguments that she wasn't really part of this plan seemed to be butting up against the conspiracy conviction. There was no conspiracy conviction. I thought the jury convicted of conspiracy. The jury instructions were. You consider first degree murder first. And if you don't find first degree murder, you go right to second degree as a lesser conspiracy is off the table. So the element. Maybe I'm mixing up with the conspiracy for Lee. The jury didn't find. Oh, I'm sorry. I guess maybe there's probably. But sorry. Once premeditation is off the table, the crime has to be viewed at the time of the shooting because the government introduces all this evidence about that argument is on the premise that by not convicting on murder one, they necessarily disbelieve all of the things about advanced knowledge. And I'm not sure that that proposition follows. Because for the government noted, we don't really know what jurors do, and they make their own decisions. And so I don't think not convicting on murder one means that they they inherently rejected all of the entire premise that there was some sort of plan or idea of what might happen that night. We know 12, oh, they rejected the idea that there was a premeditation. And that and that is the issue that they rejected. And we know that the crime they convicted her of was based on an argument the government made, which was look at what she did after the shooting. And the jury looked at what she did after the shooting. Why are we limited to thinking that they would convict on murder to only on the theory that the government was arguing? Couldn't they have convicted on whatever series of facts that they found that met the elements of that claim that they were properly instructed on? Again, they rejected premeditation. And so under the facts, if you look at when premeditation stops, it stops at the time of the shooting, because you've got all these other all this other evidence that the government is suggesting shows her her intent to want to be involved with Wayne Dow and Wayne Lee in this crime. And the jury rejected that, but let me say quickly a couple of things at the beginning of the 2nd interview special agent show indicates that she was in shock in the 1st interview. Why do we not just accept his characterization of that? Because if she was a shock at the time of the 1st interview, then that original waiver does goes out the window. The fact that she knew people who were in law enforcement. My wife has been married to me 46 years. I bailed the jail courses and police practices courses from yellow cameras are if I asked my wife what a Miranda warning is. She doesn't know what a Miranda warning is. If the government wanted to introduce people to say, yes, I talked to Sheila Ritz about a Miranda warning. They could have done that during the course of the motion. Eliminate hearing and they didn't. They could have called officers who supposedly might have Miranda's or in prior crimes. They didn't. That's a burden on the government. Finally, the suggestion that she should have followed the advice of Wayne Lee, who's telling her not to say anything to protect himself versus the officers who are telling her right out of the bat. You need to talk to us so you can stay with your daughter and not be separated from your daughter for the rest of your life. This case is tingle. It is tingle all over again, except it's tingle with profanity. If one of you judges said to me, Mr. Weikert, I think your argument is effed up and I think it is BS and I'm going to report you to the bar for it. Even if I believed in the strength of my argument, if I'm facing the fact that my career of 40 some years is going down the drain, I listen to that profanity and I am scared to death. That's the same thing that happened with Sheila Ritz. She was scared to death and that's why she kept talking because the agents promised her that it was going to be in her best interest when it was not. Thank you all sides for the very helpful arguments in these difficult cases. These cases are submitted. Thank you.
judges: FRIEDLAND, FORREST, DESAI